PUERTO RICO DRYDOCK & MARINE TERMINALS, INC., demandante y recurrida, *v.* SECRETARIO DE HACIENDA DE PUERTO RICO, demandado y recurrente.

Número 12006.

*Sometido:* 28 de marzo de 1960. *Resuelto:* 17 de mayo de 1961.

*J. B. Fernández Badillo,* Secretario de Justicia, *Arturo Estrella,* Secretario Auxiliar de Justicia *y* Manuel J. Medina Aymat *y* Carlos N. Souffront, *Procuradores Auxiliares,* abogados del recurrente; *Fiddler, González, Faure & Guillemard,* abogados de la recurrida; *James R. Beverley, R. Castro Fernández y Francisco Castro Amy,* como *amici curiæ.*

EL JUEZ ASOCIADO SEÑOR PÉREZ PIMENTEL emitió la opinión del Tribunal.

La Ley Núm. 77 de 1ro. de mayo de 1941 (Leyes de Puerto Rico, año 1941, páginas 671–673) autorizó al Gober-

nador de Puerto Rico y al Comisionado del Interior a traspasar en venta al Gobierno de los Estados Unidos, para fines de defensa nacional, un dique de carena y los terrenos en que el mismo está construido.

Con el propósito de aligerar dicho traspaso y previo acuerdo entre el Departamento de la Marina de Estados Unidos y el Comisionado del Interior de Puerto Rico, el Gobierno de los Estados Unidos expropió dicha propiedad y adquirió y aceptó la jurisdicción exclusiva sobre la misma al tomar posesión de ella en el año 1941.

Una vez terminada la emergencia nacional, el Departamento de la Marina cedió en arrendamiento a la Abarca Dry Dock Corporation[1] la propiedad antes indicada. Dicha corporación se ha dedicado desde su organización al negocio de reparación de embarcaciones marítimas, servicios marítimos en la operación de un dique flotante y un dique de carena, y servicios de carga y descarga dentro de los terrenos arrendados al Gobierno de los Estados Unidos.

Para el día 1ro. de enero de 1952 la arrendataria era dueña de ciertos bienes muebles consistentes en efectivo en caja, materiales y efectos, muebles y enseres, embarcaciones, maquinaria y utensilios de carga y descarga. Dichos bienes estaban todos situados dentro de los terrenos propiedad del Gobierno de los Estados Unidos que habían sido arrendados a Abarca Dry Dock Corporation.

En junio 15 de 1953 el Secretario de Hacienda notificó a la corporación arrendataria la imposición, para el año fiscal 1952–53, de una contribución sobre la propiedad mueble anteriormente descrita.

La contribuyente recurrió ante el Tribunal Superior atacando la legalidad de dicha imposición fundándose en que los bienes sobre los cuales se había pretendido imponer la contribución están situados totalmente fuera de la jurisdicción

---

[1] Posteriormente esta Corporación cambió su nombre por "Puerto Rico Dry Dock and Marine Terminals" que es la que figura ahora como demandante-recurrida.

contributiva del Estado Libre Asociado de Puerto Rico, ya que radicaban en terrenos cedidos por el Pueblo de Puerto Rico al Gobierno de los Estados Unidos a través de legislación aprobada a ese efecto, y que toda jurisdicción para imponer contribuciones sobre los bienes muebles o inmuebles situados en dichos terrenos había sido cedida incondicional y totalmente y con carácter exclusivo al Gobierno de los Estados Unidos.

El Tribunal Superior declaró con lugar la contención de la contribuyente y dictó sentencia anulando la indicada imposición contributiva y el demandado ha recurrido ante nos solicitando que la revoquemos.

■ La Ley Núm. 77 de 1941 que autorizó al Gobernador y al Comisionado del Interior a traspasar en venta a los Estados Unidos los terrenos del dique de carena, guarda silencio en lo que a jurisdicción respecta. Sin embargo por Ley de 16 de febrero de 1903 el Pueblo de Puerto Rico dio su consentimiento a los Estados Unidos para adquirir, para fines navales y militares y otros fines públicos, por compra o expropiación forzosa, cualesquiera terrenos en la Isla de Puerto Rico y cedió jurisdicción exclusiva a los Estados Unidos sobre los terrenos así adquiridos. Dicha ley disponía no obstante "que si subsiguientemente los Estados Unidos enajenaren cualquiera o todas las tierras adquiridas en esta forma, el Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas". También retuvo jurisdicción concurrente con los Estados Unidos sobre ofensas y delitos cometidos en las tierras de la Isla de Culebra traspasadas a los Estados Unidos. (²)

---

(²) La Ley de 16 de febrero de 1903 dispone en sus secciones 5 y 6 lo siguiente:

"Sección 5.—Que se dé y por la presente se da, el consentimiento a los Estados Unidos para adquirir, para fines navales o militares u otros fines públicos, por compra o expropiación forzosa, cualesquiera, terrenos en la Isla de Puerto Rico, y cuando fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de 'El Pueblo de Puerto Rico' cesará y terminará ipso facto. Disponiéndose no obstante que, si subsecuente-

El art. 1, sección 8, cláusula 17 de la Constitución de los Estados Unidos, otorga poder al Congreso para ejercer jurisdicción exclusiva sobre todos los sitios comprados con el consentimiento de la legislatura del estado donde los mismos radican, para la construcción de fuertes, polvorines, arsenales, muelles y otros edificios públicos. En *Moore* v. *Corte*, 59 D.P.R. 620, este Tribunal resolvió que esa cláusula constitucional que habla expresamente de legislaturas esta-

mente los Estados Unidos enajenaren cualquiera o todas las tierras adquiridas en esta forma, El Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas.

"Sección 6.—Que la jurisdicción exclusiva sea y es por la presente cedida a los Estados Unidos sobre cualquiera y todas las tierras que puedan en adelante adquirir en la Isla de Puerto Rico por compra o expropiación forzosa; sobre cualquiera y todas las tierras y riberas o márgenes de las mismas, incluyendo calles y otros caminos y vías públicas, traspasadas a los Estados Unidos por el Gobernador de Puerto Rico por las disposiciones de esta ley; y sobre cualquiera y todas las tierras en que cualquier interés, derecho o reclamación de 'El Pueblo de Puerto Rico' puedan más tarde ser renunciados en favor de los Estados Unidos por el Gobernador de Puerto Rico, de conformidad con esta ley. Disponiéndose, no obstante, que en y sobre cualesquiera tierras adquiridas por los Estados Unidos, o traspasadas a los mismos por los términos de esta ley, de la Isla de Culebra, el Pueblo de Puerto Rico retendrá jurisdicción concurrente con los Estados Unidos sobre ofensas y delitos cometidos dentro de los límites de las tierras así traspasadas; tal jurisdicción, no obstante, deberá ejercerse solamente cuando se hagan cargo por el oficial de la marina, u otro oficial de los Estados Unidos encargado de las mismas."

La Ley núm. 2 de 18 de noviembre de 1953 enmendó la sección 5 de la Ley de 1903 para incluir el *arrendamiento* como una de las formas de adquisición mediante la cual el Gobierno de los Estados Unidos podía adquirir jurisdicción exclusiva sobre terrenos en Puerto Rico para los fines expresados en dicha sección. (28 L.P.R.A., sección 45.)

La Ley Núm. 63 de 10 de junio de 1955 derogó la indicada sección 5 de la Ley de 1903 (28 L.P.R.A., sección 45—Suplemento Acumulativo de 1956).

El art. 3 de la citada Ley 63 dispone que la jurisdicción se entenderá cedida bajo las condiciones expresas de que dentro de los terrenos adquiridos por los Estados Unidos podrán llevarse a cabo arrestos, citaciones y emplazamientos que se originen bajo las Leyes de Puerto Rico, así como embargos y otras disposiciones judiciales . . . . con respecto a bienes localizados en dichos terrenos siempre y cuando no se afecten las propiedades de Estados Unidos, o el uso, o beneficio que derive Estados Unidos de dichos bienes, o los fines para los cuales se adquieren.

duales no se aplicaba al territorio organizado y no incorporado de Puerto Rico, (³) siendo la Ley de 1903 la ley aplicable. También se dijo en dicho caso a la página 624:

"Como puede verse la ley de Puerto Rico y la cláusula constitucional citadas coinciden en que la jurisdicción de los Estados Unidos será exclusiva cuando la adquisición de tierras en los estados con el consentimiento de sus legislaturas lo sea por compra y para la construcción de fuertes, polvorines, arsenales, muelles y otros edificios necesarios (Constitución Nacional), por compra o expropiación para fines navales o militares u otros fines públicos (Ley del Territorio). En tal virtud puede y debe recurrirse a la jurisprudencia interpretativa de la cláusula constitucional para fijar el alcance de la disposición legal del territorio."

La jurisdicción exclusiva que el Gobierno de los Estados Unidos adquiere en virtud de la cláusula 17 de la sección 8, art. 1 de la Constitución (en Puerto Rico en virtud de la Ley de 16 de febrero de 1903) excluye el ejercicio del poder contributivo del estado sobre los terrenos así adquiridos y sobre los bienes situados en los mismos aunque éstos pertenezcan a entidades particulares y no sean propiedad del gobierno. Véanse, *Surplus Trading Co.* v. *Cook*, 281 U.S. 647; *S. R. A.* v. *Minnessota*, 327 U.S. 558; *Yellowstone Park Transp. Co.* v. *Gallatin County*, 31 F.2d 644, *cert. denegado*, 280 U.S. 555; *City of Franklin* v. *Coleman Bros. Corp.*, 152 F.2d 527; *James* v. *Dravo Contracting Co.*, 302 U.S. 134; *Palmer* v. *Barrett*, 162 U.S. 399; *Benson* v. *United States*, 146 U.S. 325; *Arlington Hotel* v. *Fant*, 278 U.S. 439; *United*

El art. 4 dispone que la jurisdicción concedida continuará solamente mientras Estados Unidos sea el propietario o esté en la posesión de los terrenos, y éstos sean usados para los fines navales o militares y otros fines públicos para los que fueren adquiridos y que en caso de que Estados Unidos dejare de ser propietario de los terrenos o de estar en posesión de los mismos, o en caso de que no fueren usados para los fines que fueron adquiridos, el Estado Libre Asociado de Puerto Rico volverá a tener jurisdicción sobre ellos (28 L.P.R.A., secs. 46 a 47—Suplemento Acumulativo de 1956).

(³) Como la contribución en litigio fue tasada en enero de 1952, no surge cuestión alguna en cuanto al nuevo status político de Puerto Rico.

*States* v. *Unzeuta*, 281 U.S. 138; *United States* v. *Fallbrook Public Utility Dist.*, 108 F. Supp. 72; *Wheeling Steel Corp.* v. *Fox*, 298 U.S. 193.

No obstante, el Congreso de los Estados Unidos ha permitido que los estados adquieran nuevamente el derecho a imponer contribuciones dentro de los terrenos pertenecientes a/y bajo la jurisdicción exclusiva de los Estados Unidos. La ley conocida como el "Buck Act" aprobada en 9 de octubre de 1940 ([4]) devolvió a los Estados, Territorios y Posesiones, la facultad de imponer contribuciones sobre la gasolina vendida a particulares dentro de terrenos federales, contribuciones sobre las ventas y el uso (sales and use taxes) efectuados en dichos terrenos y contribuciones sobre ingresos a personas residentes en los terrenos en que anteriormente la jurisdicción federal había sido exclusiva para todos los fines. ([5])

El Congreso también cedió poder contributivo a los estados en virtud de la Ley de Arrendamientos Militares aprobada en 5 de agosto de 1947 (61 Stat. 774; en 34 U.S.C., sección 522a) bajo cuya autoridad se otorgó el contrato de arrendamiento a favor de la demandante recurrida.

Dispone esa ley, en lo pertinente, que siempre que el Secretario de la Guerra o el Secretario de la Marina estimen que es ventajoso para el Gobierno, quedan autorizados para arrendar aquella propiedad real o personal bajo la jurisdicción de su Departamento . . . y que de momento no se

---

([4]) 54 Stat. 1059, codificada en junio 30 de 1947, 61 Stat. 641; 10 U.S.C., sección 1270.

([5]) Para la interpretación del "Buck Act" sosteniendo el poder de tributación local sobre venta, uso e ingresos de intereses privados que se encontraban dentro de terrenos federales adquiridos a tenor con el art. 1, sección 8, cláusula 17 de la Constitución y hasta entonces bajo la jurisdicción exclusiva de los Estados Unidos, véanse: *Sander* v. *Oklahoma Tax Comm.* (1946), 169 P.2d 748, *cert. denegado*, 329 U.S. 780; *Minnesota* v. *Keeley*, 126 F.2d 863; *Hill* v. *Joseph* (1954), 129 N.Y.S.2d 348; *Kiker* v. *City of Philadelphia*, 31 A.2d 289, *cert. denegado*, 320 U.S. 741; *Carnegie-Illinois Steel Corp.* v. *Alderson* (1945), 34 S.E.2d 737, *cert. denegado*, 326 U.S. 764; *Howard* v. *Comm. of Sinking Fund of City of Louisville*, 344 U.S. 624, 97 L. ed. 617; *City of Springfield* v. *Kenney*, 104 N.E.2d 65.

requiera para uso público, a aquel arrendatario o aquellos arrendatarios, y en los términos y condiciones que a su juicio fomente la defensa nacional o redunde en el interés público. Cada arrendamiento será por un período que no exceda de cinco años a menos que el Secretario del Departamento concernido determine que un período mayor promoverá la defensa nacional o será en beneficio del interés público . . . En todo caso todo arrendamiento será rescindible por el Secretario del Departamento durante una emergencia nacional declarada por el Presidente.

La sección 6 de dicho estatuto dispone que el "interés del arrendatario" que surja o se cree en virtud de las disposiciones de esa ley, estará sujeto a tributación federal o local.(6)

La cuestión fundamental a ser resuelta en este recurso gira alrededor de la interpretación de la indicada sección 6 de la Ley de Arrendamientos Militares de 1947 así como del alcance del concepto "enajenaren" usado en la Ley de 16 de febrero de 1903.

El Gobierno alega (1) que bajo la Ley de Arrendamientos Militares de 1947 el Congreso confirió autorización a los estados para imponer contribuciones sobre los bienes muebles e inmuebles que radiquen dentro de los terrenos arrendados por los Estados Unidos bajo dicha ley y (2) "que como resultado del arrendamiento hecho a la recurrida el Gobierno de los Estados Unidos enajenó la propiedad, y por consiguiente, a virtud de lo dispuesto en la propia ley de 16 de febrero de 1903, Puerto Rico volvió a adquirir jurisdicción sobre el territorio.

Por su parte la demandante-recurrida y los "amicus curiæ" alegan que la contribución autorizada por la susodicha ley de 1947 es una contribución sobre interés del arrendatario como arrendatario sobre la propiedad arrendada, o sea,

---

(6) El texto inglés de dicha sección 6, en lo pertinente, es como sigue:
"Sec. 6.—The lessee's interest made or created pursuant to the provisions of this act shall be made subject to a state or local taxation . . . ."

que para que el "interés del arrendatario" envuelva determinada propiedad debe existir la relación de arrendador y arrendatario respecto a dicha propiedad; que los bienes tasados por el Secretario de Hacienda son bienes muebles de la propiedad de la recurrida sin que dichos bienes hayan sido arrendados, ni existe respecto a los mismos relación de arrendador y arrendataria entre Estados Unidos y la recurrida; que las leyes de Puerto Rico no autorizan la imposición de contribuciones sobre el interés del arrendamiento (*lesseehold interest*) de un arrendatario sobre propiedades.

La Ley de Arrendamientos Militares de 1947 ha sido objeto de interpretación tanto por las cortes de los estados como por el Tribunal Supremo Nacional.

Las partes discuten ampliamente el alcance de la decisión en el caso de *Offutt Housing Co.* v. *Sarpy County*, 351 U.S. 253, 100 L. ed. 1151. Los hechos en dicho caso son como sigue: Offutt, una corporación de Nebraska que se organizó primordialmente para proveer hogares para la venta o alquileres, suscribió un contrato con el Secretario de la Fuerza Aérea para arrendar 63 acres de tierra y construir un proyecto de hogares en la base aérea de Offutt. El proyecto se haría de acuerdo con especificaciones del Departamento de la Fuerza Aérea y sería aprobado por el Comisionado Federal de Hogares. El término del arrendamiento era de 75 años y el canon de $100 anuales. Disponía el contrato que las "edificaciones y mejoras construídas por la arrendataria y que consistiría del proyecto de hogares, serían al ser terminados, propiedad inmueble parte de los terrenos arrendados, y edificios públicos de Estados Unidos arrendados a la arrendataria . . ." Se proveía además que a la expiración del arrendamiento o a su terminación con anterioridad, todas las mejoras edificadas sobre el terreno arrendado quedarían propiedad del Gobierno sin compensación. La corporación arrendataria debía arrendar todas las unidades del proyecto a aquel personal civil y militar de la Base que designare el

oficial Comandante bajo condiciones especificadas en el contrato y por un canon máximo aprobado por la Administración Federal sobre Hogares y por la Fuerza Aérea. El contrato contenía otras disposiciones relacionadas con la operación del proyecto en cuanto a servicios públicos, seguridad, facilidades y sobre la intervención del Comisionado de la Administración Federal de Hogares quien retendría las acciones preferidas del arrendatario bajo el Título VIII de la Ley Nacional de Hogares. Después de firmarse el contrato la arrendataria procedió a la construcción del proyecto y no radicó planilla contributiva a pesar de que el Procurador General de Nebraska había dictaminado que su interés en el proyecto, incluyendo toda la propiedad personal usada en el mismo tributaba como "propiedad personal". El condado de Sarpy le impuso contribuciones sobre el mobiliario, las herramientas y equipo, enseres del hogar y mejoras capitales.

El Tribunal Supremo de los Estados Unidos, confirmando a la Corte Suprema de Nebraska, sostuvo la legalidad de la contribución resolviendo que en virtud de las disposiciones de la Ley de Arrendamientos Militares de 1947 y la *Wherry Military Housing Act* de 1947, el Congreso había dado su consentimiento para imponer la contribución del tipo allí envuelto.

Alegaba la contribuyente que la contribución estatal, medida por el valor total de las edificaciones y las mejoras, no era una contribución sobre el "interés del arrendatario" y sí sobre el valor total de los bienes pertenecientes al Gobierno. A este respecto dijo el Tribunal que llamar al Gobierno "el dueño" no le impedía determinar la naturaleza del interés realmente creado, y ello no resolvía el problema. Consideró que como el arrendamiento era por 75 años y se había estimado que la vida útil de los edificios y las mejoras era de 35 años, el disfrute del valor total de unas y otras sería de la arrendataria y que en tales circunstancias el título del Gobierno era sólo un título en papel.

La arrendataria alegó también que la contribución sobre los utensilios y mobiliario era ilegal porque dichos bienes eran de su propiedad particular, nunca los obtuvo del Gobierno y por lo tanto el interés de ella sobre tales bienes no fue creado o surgió de las disposiciones de la Ley de Arrendamientos Militares de 1947. Sobre este extremo dijo el Tribunal: "Aquí de nuevo con usar un nombre, el de 'dueño' en relación con la peticionaria, no resuelve el problema. Aparece de los autos que la peticionaria venía obligada a suplir dichos bienes para el proyecto de hogares. La peticionaria y sus inquilinos tendrían el uso completo de los mismos durante el término del arrendamiento y dichos bienes o sus repuestos debían dejarse en la propiedad al vencer el arrendamiento. El interés de la peticionaria en tales bienes al igual que su interés en las edificaciones, se determina por su contrato con el Gobierno, y tomando en cuenta los propósitos de la sección 6, interpretamos dicha sección como que le da igual trato a ambas cosas."

A los fines de determinar el alcance de la decisión en el caso de *Offutt*, es imprescindible hacer referencia al escolio 2 de dicha opinión. Lee así: "El récord no indica claramente la relación de las partes respecto al mobiliario—valorado en $205 en la valoración total de 1952 de la propiedad tributable, ascendente a $825,685. Este es un asunto de menor importancia y dejamos a la peticionaria que solicite remedio en las cortes de Nebraska si es que el interés del Gobierno y de la peticionaria en el mobiliario es significativamente diferente de su interés en los utensilios o edificios."

A nuestro juicio *Offutt* resuelve (*a*) que la Ley Wherry debe ser leída como que incluye la sección 6 de la Ley de Arrendamientos Militares de 1947, (*b*) que bajo los hechos del caso la contribución local sobre interés del arrendatario puede imponerse tomando como medida el valor total de los edificios y las mejoras y (*c*) que el interés del arrendatario en los bienes muebles que ésta venía obligada a proveer para

el proyecto de hogares se determinaba, al igual que su interés en los edificios por su contrato con el gobierno y que la sección 6 le daba igual trato a ambas cosas.

No podemos convenir con el gobierno en que *Offutt* resuelve directamente el punto aquí envuelto. Más bien puede inferirse de la opinión emitida en dicho caso, ya que tampoco lo resuelve, que el poder de legislación exclusiva conferido al Congreso en áreas federales por el Art. 1, Sección 8, cláusula 17, de la Constitución Nacional, impide la tributación estatal sobre propiedad privada localizada en una base militar adquirida a tenor con dicha disposición constitucional si dicha propiedad no es parte del "interés del arrendatario" creado o que surja del contrato de arrendamiento.

Al enfrentarse el Tribunal Supremo federal con la alegación de la arrendataria al efecto de que la contribución impuesta sobre los utensilios y mobiliario era inválida porque dicha arrendataria era la dueña de dichos bienes, nunca los compró al gobierno y que por lo tanto su interés en los mismos no surgió o se creó a tenor con la Ley de Arrendamientos Militares de 1947, hubiera bastado a dicho Tribunal, de estar en lo correcto el Secretario de Hacienda, despachar el planteamiento diciendo que por la sección 6 de la susodicha Ley de Arrendamientos Militares el Congreso había consentido la contribución estatal sobre propiedad mueble privada localizada en áreas federales arrendadas a tenor con dicha ley. Lejos de resolverlo en esa forma, el Tribunal recurrió al argumento de que el interés de la arrendataria en los indicados bienes muebles surge del contrato con el Gobierno porque la arrendataria venía obligada a proveerlos y que por lo tanto era un interés similar a su interés en los edificios.

Colegimos que en *Offutt* se sostuvo la validez de la contribución local a base de que la misma fue impuesta sobre el "interés de la arrendataria" que surgió o fue creado en virtud de la Ley de Arrendamientos Militares de 1947.

En algunos casos anteriores y en otros posteriores algunas cortes han seguido la misma doctrina del caso de *Offutt* sosteniendo la validez de la contribución local o estatal sobre el "interés del arrendatario" surgido o creado en virtud de la Ley de Arrendamientos Militares. Véanse, *Meade Heights* v. *State Tax Comm.*, 95 A.2d 280; *Bragg International Co.* v. *Cumberland County*, 96 S.E.2d 341; *Fort Dix Apartments Corp.* v. *Borough of Wrightstown*, 225 F.2d 473. *Cf. Nellis Housing Corp.* v. *State* (1959), 339 P.2d 758.

En *International Business Machine Corp.* v. *Vaughn* (1957), 98 So.2d 747, y en el cual se cita el caso de *Offutt*, se resuelve que ciertas máquinas de calcular eléctricas pertenecientes a una entidad privada pero localizadas en terrenos federales cedidos por el Estado de Florida no estaban sujetas a tributación estatal o local porque Florida confirió jurisdicción exclusiva al Gobierno de los Estados Unidos sin reservarse el poder de tributación, ni el Congreso dio su consentimiento para ello.

En *International Business Machines Corp.* v. *Ott* (1956), 89 So.2d 193, se negó igualmente poder contributivo al estado de Louisiana sobre bienes muebles pertenecientes a particulares y localizados en terrenos cedidos por dicho estado al Gobierno de los Estados Unidos.

Con posterioridad al caso de *Offutt* el Tribunal Supremo Nacional ha resuelto tres casos que envuelven tributación estatal en relación con propiedad federal. En ninguno de ellos se resuelve el punto que estamos discutiendo ya que no envolvían la tributación estatal de propiedad privada dentro de los límites de terrenos pertenecientes a/y bajo la jurisdicción exclusiva de Estados Unidos. Además en dichos casos existía una ley del estado que expresamente imponía la contribución impugnada.

En uno de esos casos, *United States* v. *Detroit*, 355 U.S. 466, 2 L. Ed.2d 424, el estatuto de Michigan imponía contribución a las personas particulares que usaran propiedad real

exenta en un negocio con fines lucrativos tal como si la persona particular fuera dueña de dicha propiedad. Se trataba de una planta industrial perteneciente a los Estados Unidos y arrendada a la contribuyente. El estatuto disponía que ni la propiedad ni su dueño respondía de la contribución. El Tribunal Supremo sostuvo la validez del estatuto a base de que se trataba de una contribución sobre el derecho de uso de la propiedad y no de una contribución sobre la propiedad en sí aunque se tomara como medida para la imposición de la contribución el valor de la propiedad.

En *Detroit* v. *Murray Corp.*, 355 U.S. 489, 2 L. Ed. 2d 441, estaba envuelto el mismo estatuto de Michigan. La contribución local se impuso sobre propiedad mueble consistente en partes para aeroplanos, instrumentos y materiales que estaban en posesión de un subcontratista y cuyos bienes, conforme al contrato, pasaban a ser propiedad del gobierno federal una vez éste hacía pagos parciales del precio de los mismos. Se sostuvo la contribución a base que en sus efectos la contribución era similar a la impuesta a personas que usaban propiedad exenta. En *United States* v. *Township of Muskegon*, 355 U. S. 484, 2 L. Ed. 2d 436, se presentaba la misma cuestión básica del caso de *United States* v. *Detroit*, supra. Las únicas dos diferencias consisten en que la contribuyente usaba la propiedad federal en virtud de un permiso y no de un contrato de arrendamiento y en que la contribuyente usaba dicha propiedad en relación con el cumplimiento de un contrato con el gobierno.

Nos damos cuenta de que en el caso de *Offutt* se hace énfasis en el hecho de que el historial de la Ley de Arrendamientos Militares indica la preocupación del Congreso por la pérdida de ingresos por parte de los gobiernos locales y de su deseo de evitar la competencia desleal de los negocios radicados fuera de terrenos federales. Asimismo hemos observado la tendencia del Tribunal Supremo Nacional de limitar, mediante interpretación, la inmunidad contributiva

constitucional cuando se trata de entidades privadas dedicadas a negocios lucrativos. Sin embargo no podemos interpretar la Ley de Arrendamientos Militares de 1947 como que incluye un consentimiento del Congreso a los estados para tributar propiedad mueble privada radicada en terrenos federales arrendados, si tal consentimiento no se expresa o se infiere de dicha ley. El "interés del arrendatario" para que esté sujeto a contribución estatal debe crearse o surgir de la Ley de Arrendamientos Militares como ocurrió en el caso de *Offutt* y en otros casos más. En estos casos el arrendatario tenía un interés en el arrendamiento que consistía en el disfrute de los bienes inmuebles y muebles y en los cuales el gobierno tenía también un interés ya que los mismos pasaban a ser de su pertenencia al finalizar el término del arrendamiento. El interés del gobierno en dichos bienes no estaba sujeto a tributación pero sí lo estaba el interés del arrendatario porque el mismo fue creado o surgió en virtud del contrato otorgado bajo las disposiciones de la Ley de Arrendamientos Militares.

En el caso que nos ocupa la contribución ha sido impuesta sobre bienes muebles que pertenecen exclusivamente a la arrendataria, no fueron adquiridos en virtud de obligación alguna impuéstale en el contrato de arrendamiento, ni habrán de pertenecer al Gobierno de los Estados Unidos a la expiración del arrendamiento. El gobierno federal no tiene interés en dichos bienes y el interés de la arrendataria en los mismos no ha sido creado ni ha surgido en virtud de las disposiciones de la Ley de Arrendamientos Militares. En su consecuencia procede concluir que bajo las disposiciones de dicha ley, y la Ley de 1903 de Puerto Rico, los referidos bienes no tributan. Al así resolverlo no hemos considerado el alcance y efecto de la Ley Núm. 63 de 10 de julio de 1955 que derogó el art. 5 de la Ley de 1903. Véase escolio 2 antes.

■ Un segundo punto levantado por el recurrente es al efecto de que el Gobierno de los Estados Unidos perdió su jurisdicción al arrendar los terrenos. Su tesis descansa en que un "arrendamiento" equivale a una "enajenación" según se usa este último término en la Ley de 1903.(7)

No tiene razón. El propio recurrente admite que como regla general el término "enajenación" en su sentido estricto, no incluye arrendamiento ya que *"Enajenación*, en su sentido estricto, implica traspaso de dominio, lo cual indudablemente no ocurrió en el presente caso." En su sentido amplio, bajo el derecho Español, la enajenación tampoco comprende el arrendamiento. Véase *García et al.* v. *Garzot*, 18 D.P.R. 866, 876.

El caso de *R. Fabián & Co.* v. *Registrador*, 22 D.P.R. 801, citado por el recurrente, lo que decide es que un poder para enajenar, vender, gravar e hipotecar, ceder y permutar bienes inmuebles, no confiere poder para arrendar. "El contrato de arrendamiento—se dijo a la página 802—puede, quizás ser considerado como un acto de administración, pero ningún poder para administrar fue conferido . . ." Véanse *Berrocal* v. *Tribl. de Distrito y Fournier, Int.*, 75 D.P.R. 85, 93 y *Pérez* v. *Hawayek*, 69 D.P.R. 50.

En el discutido problema de si el arrendamiento crea a favor del arrendatario un derecho de naturaleza real o un simple derecho personal o de crédito, problema éste que no intentamos ahora resolver y al cual sólo aludimos como ilustración, Castán se adhiere al último concepto y dice: "El

---

(7) El término del arrendamiento era de cinco años con opción a prórroga por tres términos adicionales de 5 años previa notificación escrita a la arrendadora con 120 días de anticipación al vencimiento del contrato. El contrato dispone además, que el Secretario de la Marina puede dar por terminado el contrato en cualquier tiempo antes de la expiración de su término, (*a*) durante cualquier emergencia nacional declarada por el Presidente o el Congreso, (*b*) previa notificación escrita a la arrendataria con 90 días de anticipación cuando el Secretario determine que los intereses nacionales así lo requieren, y (*c*) previo aviso a la arrendataria con 10 días de anticipación si (1) la arrendataria dejase de cumplir cualesquiera de sus obligaciones y no las corrigiera dentro de 10 días, . . . y (2) . . . . .

arrendamiento, derecho de carácter personal, puede, por virtud de la inscripción (en los casos en que ésta sea procedente, conforme a la Ley Hipotecaria), *producir cierto efecto real*, cual es el de obligar al adquirente de la finca a respetar el arrendamiento (art. 1571 del Código Civil). Pero este efecto parcial no modifica la relación jurídica. 'El contenido de los derechos del arrendatario—dicen Pérez González y Alguer—no se altera por su inscripción, sino únicamente quedan garantizados frente al adquirente ulterior.' Por ello no pierde el arrendamiento su naturaleza de relación meramente obligatoria." (Castán, Vol. 4, pág. 241.)

Un ligero examen de las disposiciones de nuestro Código Civil sobre el contrato de arrendamiento, desvanece toda duda de que el término *enajenar* usado en la Ley de 1903, no incluye un arrendamiento como el aquí envuelto.[8]

*Por los anteriores motivos, la sentencia del Tribunal Superior, Sala de San Juan, será confirmada.*

El Juez Asociado Sr. Balaval disintió.

El Juez Asociado Sr. Santana Becerra no intervino.

---

[8] Véase, sin embargo, en cuanto a arrendamientos que en sí constituyen un traspaso de la propiedad, *De la Haba* v. *Tribunal de Contribuciones,* 76 D.P.R. 923.