EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| HBA Contractors, Inc.<br><br>    Demandante-peticionaria<br><br>vs.<br><br> Municipio de Ceiba<br><br>    Demandado-recurrido | Certiorari<br><br>2005 TSPR 183<br><br>166 DPR ____ |

Número del Caso: CC-2003-639

Fecha: 6 de diciembre de 2005

Tribunal de Apelaciones:

                Circuito Regional VII de Carolina y Fajardo

Juez Ponente:

                Hon. Rafael L. Martínez Torres

Abogado de la Parte Peticionaria:

                Lcdo. Rafael M. Santiago Rosa
                Lcdo. Josué A. Rodríguez Robles

Abogados de la Parte Recurrida:

                Lcdo. Alberto Rodríguez Ramos
                Lcda. Cristina S. Belaval Burger
                Lcdo. Angel S. Ruiz Rodríguez
                Lcdo. Antonio Bauzá Torres

Materia: Revisión de Determinación Final Sobre Cobro Arbitrios


Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

HBA Contractors, Inc.

    Demandante-peticionaria

        vs.                          CC-2003-639     CERTIORARI

Municipio de Ceiba

    Demandado-recurrido

OPINIÓN DEL TRIBUNAL EMITIDA POR EL JUEZ ASOCIADO SEÑOR REBOLLO LÓPEZ

San Juan, Puerto Rico, a 6 de diciembre de 2005

Los hechos del presente caso --sobre los cuales no existe controversia-- revelan que entre los años 1997 a 1999 el Departamento de Defensa de los Estados Unidos contrató a HBA Contractors, Inc., en adelante HBA[1], para que realizara dos (2) proyectos de construcción en terrenos federales localizados en la Base Naval Roosevelt Roads, en el Municipio de Ceiba, en adelante el Municipio. Ambos proyectos consistían en remodelar y/o renovar unas estructuras existentes

---

[1] HBA es una corporación debidamente organizada y haciendo negocios a tenor con las leyes del Estado Libre Asociado de Puerto Rico. La referida entidad se dedica desde su incorporación al negocio de la construcción.

dentro de la referida base. El primer proyecto consistía en la reparación y remodelación de una estructura utilizada como hangar [2] y el segundo proyecto en la renovación y alteración interior de un edificio de residencia de oficiales solteros.[3]

En vista a este contrato, el $1^{ro}$ de mayo de 2000 el Municipio le envió una carta a HBA notificándole que adeudaba la cantidad de $216,858.80 por concepto de arbitrios de construcción.[4]  A solicitud de HBA, el 10 de julio de 2000, ésta y el director de finanzas del Municipio, Andrés Ruiz Rodríguez, se reunieron para aclarar la existencia de la alegada deuda de arbitrios de construcción.

---

[2] El contrato de este primer proyecto se firmó el 30 de septiembre de 1997. Este proyecto se llevaría a cabo por la cantidad de $2,263,000. Posteriormente, el 27 de septiembre de 1999, en virtud de una enmienda al contrato original, el costo total del proyecto aumentó a $2,514,470.

[3] Este contrato se firmó el 20 de septiembre de 1999. Este segundo proyecto se llevaría a cabo por la cantidad de $2,907,000. Posteriormente, el 11 de julio de 2000, el costo original del proyecto fue revisado y aumentado a $2,938,484.

[4] El referido arbitrio fue calculado conforme a las disposiciones de la Ordenanza Municipal Núm. 8, Serie 1991-1992, aprobada el 15 de octubre de 1991, y la Ordenanza Núm. 33, Serie 1997-1998, aprobada el 27 de mayo de 1998, del Municipio de Ceiba, la cual derogó y sustituyó a la antes mencionada ordenanza. Éstas autorizaron al Municipio a imponer y cobrar un arbitrio de construcción por proyectos --como los que tenía que realizar HBA-- dentro de los límites territoriales del Municipio.

Al día siguiente, HBA le envió una carta al Municipio en la cual resumió lo acontecido en dicha reunión y recalcó sus planteamientos sobre los errores en el cómputo de los arbitrios de construcción.[5] Así las cosas, el 25 de agosto de 2000, el Municipio le envió una segunda carta a HBA en la cual le notificó una determinación final de arbitrios de construcción, ascendentes a $179,141.75, cantidad que no incluía los intereses, recargos y penalidades.[6]

El 14 de septiembre de 2000, HBA presentó ante el Tribunal de Primera Instancia, Sala Superior de Fajardo, una demanda contra el Municipio, en la cual solicitó la revocación de la determinación final del Municipio

---

[5] A esos efectos, HBA hizo constar, entre otras cosas, que consideraba que había un error de cómputo en el cálculo de los arbitrios de construcción toda vez que se había aplicado por error la ordenanza municipal incorrecta y se habían utilizado tasas incorrectas en el cálculo del arbitrio. Indicó que se había utilizado equivocadamente la taza de la Ordenanza Núm. 33, ante, que fue firmada el 27 de mayo de 1998, fecha posterior al comienzo del proyecto del hangar. En virtud de lo anterior, señaló que era la Ordenanza Núm. 8, ante, la que debía ser utilizada para computar los arbitrios del primer proyecto.

[6] Determinó el Municipio que efectivamente la Ordenanza que aplicaba al proyecto del Hangar era la Núm. 8 y a todos los trabajos realizados por la compañía antes del 27 de mayo de 1998. No obstante determinó que la referida ordenanza no aplicaba al segundo proyecto. Del mismo modo informó, que no aplicaba el inciso B-2 de la sección 4ta de la Ordenanza Núm. 8 ni de la Sección 3ra de la Ordenanza Núm. 33, respectivamente. Toda vez que estos incisos aplicaban únicamente a reparaciones, ampliaciones, demoliciones, alteraciones y mejoras a un costo de $10,000 o más, en unidades unifamiliares, cuya construcción no fuera parte de un proyecto de vivienda, urbanización, condominio u otros proyectos de similar naturaleza, cuyo costo total sea de $50,000 o menos.

respecto a la imposición del arbitrio de construcción. Alegó, en síntesis, que la actuación del Municipio al imponer el arbitrio sobre los proyectos realizados por HBA en la mencionada Base Naval constituía una actuación *ultra vires* del Municipio debido a que éste carecía de jurisdicción para ello. En la alternativa, solicitó que se ordenara al Municipio utilizar una tasa de interés distinta para hacer el cómputo del arbitrio, ya que, según alegó, éste había utilizado tasas incorrectas y no sustentadas por las ordenanzas municipales aplicables a cada uno de los proyectos.

Luego de varios trámites procesales, y antes de que el Municipio presentara su contestación a la demanda, HBA presentó una moción solicitando que se dictara sentencia sumaria a su favor. En la misma nuevamente alegó que el Municipio carecía de jurisdicción, y facultad en ley, para imponer arbitrios de construcción sobre obras realizadas en los predios de la Base Naval Roosevelt Roads.

El Municipio se opuso a la referida moción y solicitó, a su vez, que se dictara sentencia sumaria a su favor. Alegó, en síntesis, que al amparo de la Ley de Municipios Autónomos, Ley Núm. 81 de 30 de agosto de 1991, según enmendada, 21 L.P.R.A. § 4001 *et. seq.*, el Municipio tenía jurisdicción para imponer y cobrar el referido arbitrio. Alegó, además, que mediante la Ley Buck, 4 U.S.C.A. § 105 *et. seq.*, el gobierno federal había autorizado, por excepción, la imposición del arbitrio de

construcción a obras o proyectos de construcción sitos en lugares como la Base Naval de Roosevelt Roads.

Así las cosas, y no existiendo controversia alguna sobre los hechos en el caso, el 11 de octubre de 2002 el foro primario emitió sentencia sumaria declarando con lugar la demanda y revocando la determinación final de arbitrios de construcción del Municipio. A esos efectos, resolvió que aunque el Municipio tenía facultad para imponer el referido arbitrio sobre obras de construcción llevadas a cabo dentro de sus límites territoriales, esa autoridad no se extendía a obras realizadas dentro de la Base Naval Roosevelt Roads. Al fundamentar su determinación, expresó que mediante la Ley Buck, ante, el Congreso de los Estados Unidos había autorizado la imposición de arbitrios dentro de enclaves federales únicamente cuando fueran "contribuciones sobre ingresos". Interpretando la Ley de Municipios Autónomos, ante, y la casuística de Puerto Rico[7], el foro de instancia resolvió que el arbitrio de construcción era un *"derecho"* que se imponía por el evento de llevar a cabo la actividad comercial, calculado a base del costo total de la obra, y no una *"contribución sobre ingresos"*. En virtud de lo

---

[7] Específicamente, citó decisiones de este Tribunal relacionada con la distinción que hemos establecido entre los conceptos *contribución sobre ingresos* y *derecho* (fee). De este modo, mencionó lo resuelto en Meléndez v. Registrador, 63 D.P.R. 1023 (1944), P.R. Telephone Co. v. Tribl. Contribuciones, 68 D.P.R. 154 (1948), Esso Standard Oil v. A.P.P.R., 95 D.P.R. 772 (1968), Municipio de Carolina v. Caribair, 101 D.P.R. 943 (1974).

antes expresado, concluyó que el referido arbitrio no estaba autorizado por la Ley Buck, ante.[8]

Inconforme con esta determinación, el 10 de diciembre de 2002, el Municipio acudió --vía recurso de apelación-- ante el Tribunal de Apelaciones. Alegó, en síntesis, que el foro primario había interpretado incorrectamente la definición del concepto *"contribución sobre ingresos"* que establece la Ley Buck, ante. A tales efectos, adujo que el tribunal basó su determinación en jurisprudencia local, inaplicable al caso, cuando el mismo envolvía una cuestión de interpretación federal. Arguyó que para que la contribución estuviese cobijada por el referido estatuto federal lo necesario era establecer que la contribución se basaba o se medía con respecto al ingreso del ciudadano. De este modo, argumentó que el arbitrio aquí en cuestión estaba cobijado por la Ley Buck, ante, ya que el mismo es establecido a base del costo total de la obra declarada por el contratista; es decir, con respecto al ingreso total de la obra del contratista. En virtud de lo anterior, sostuvo que procedía la imposición de los arbitrios de construcción en cuanto a las obras realizadas por HBA en la Base Naval Roosevelt Roads.

---

[8] Precisa señalar que en la última nota al calce de la sentencia del foro primario se señaló que el arbitrio de construcción no era válido no sólo porque no existía ley o legislación federal que lo permitiera sino, además, porque no se justificaba su imposición debido a que HBA no recibiría *quid pro quo* alguno a cambio de sus bienes. Es decir, que HBA no recibiría servicio alguno a cambio del pago del referido arbitrio.

Tras varios trámites procesales, y luego de celebrar una vista oral, el foro apelativo intermedio dictó sentencia revocatoria de la emitida por el Tribunal de Primera Instancia, resolviendo que el foro primario había incidido al determinar que el Municipio no tenía facultad para imponer los arbitrios de construcción sobre los proyectos de HBA Contractors en los terrenos federales de la base Roosevelt Roads.

No obstante reiterar lo expresado por el tribunal de instancia, a los efectos de que mediante la Ley Buck el gobierno federal sólo autorizó la imposición de arbitrios dentro de enclaves federales cuando fueran *"contribuciones sobre ingresos"*, el foro apelativo intermedio señaló que el concepto de *contribución sobre ingresos*, según definido por la Ley Buck, lo que requiere es que el arbitrio se imponga: sobre, con relación a, o que sea determinada o fijada, respecto al ingreso neto, ingreso bruto o entrada bruta del ciudadano. En virtud de lo anterior, concluyó que era válida la imposición del arbitrio aquí en cuestión toda vez que se calculaba a base de las entradas brutas que el contratista terminaba recibiendo por llevar a cabo su actividad de construcción. En consecuencia, ordenó la devolución del caso al foro primario para la continuación de los procedimientos, específicamente con relación a la determinación de la cuantía del arbitrio de construcción.

Insatisfecha con este dictamen, HBA acudió --vía *certiorari*-- ante este Tribunal, señalando que incidió el Tribunal de Apelaciones al:

> …revocar la sentencia emitida por el Tribunal de Instancia, bajo el fundamento de que el arbitrio de construcción dispuesto en la Ley de Municipios Autónomos constituye una "contribución sobre ingresos" según se define dicho término en la Ley Buck, 4 U.S.C.A. § 105 *et seq.*

> …no confirmar la determinación que hizo el Tribunal de Primera Instancia en cuanto a que es inválida la imposición del arbitrio de construcción a HBA Contractors, Inc. En atención a la inexistencia de *quid pro quo*; es decir, el contribuyente no obtiene beneficio alguno a cambio del pago de dicho tributo.

Expedimos el recurso. Contando con la comparecencia de ambas partes, y estando en condiciones de resolver el mismo, procedemos a así hacerlo.

I

Por estar íntimamente relacionados entre sí, analizamos y discutimos ambos señalamientos de error en conjunto.

De entrada precisa destacar que, conforme a nuestro ordenamiento constitucional "la facultad para imponer contribuciones compete primordialmente a la Rama Legislativa". Café Rico, Inc. v. Municipio de Mayagüez, res. el 31 de octubre de 2001, 2001 T.S.P.R. 148; véase, además, Federal Deposit Insurance Corp. V. Municipio de San Juan, 134 D.P.R. 385, 390 (1993). A esos efectos, la Constitución del Estado Libre Asociado de Puerto Rico

dispone que "[e]l poder del Estado Libre Asociado para imponer y cobrar contribuciones y autorizar su imposición y cobro por los municipios se ejercerá según se disponga por la Asamblea Legislativa, y nunca será rendido o suspendido". Art. VI, Sec.2, Const. E.L.A., L.P.R.A., Tomo 1; véase, además, Levy, Inc. v. Municipio de Manatí, 151 D.P.R. 292, 299 (2000). De igual forma, nuestra Constitución le confiere a la Legislatura la facultad para "crear, suprimir, consolidar y reorganizar municipios, modificar sus límites territoriales y determinar lo relativo a su régimen y función." Const. del E.L.A., Art. VI, Sec.1, L.P.R.A., Tomo 1; véase, además: Café Rico, Inc. v. Municipio de Mayagüez, ante; Federal Deposit Insurance Corp. v. Municipio de San Juan, ante, a la pág. 391; American Express Company v. Municipio de San Juan, 120 D.P.R. 339, 344-345 (1988).

Conforme a los antes mencionados mandatos constitucionales, este Tribunal ha señalado que "los municipios no tienen un poder inherente, independiente del Estado, para imponer contribuciones". Levy, Inc. v. Municipio de Manatí, ante, a la pág. 299; véase, además, Café Rico, Inc. v. Municipio de Mayagüez, ante; Las Piedras Const. Corp. v. Municipio de Dorado, 134 D.P.R. 1018, 1021-1022 (1994); American Express Company v. Municipio de San Juan, ante a la pág. 345. No obstante lo anterior, hemos reiterado que "mediante mandato claro y expreso la legislatura puede delegarles esta facultad".

Café Rico, Inc. v. Municipio de Mayagüez, ante; véase, además, Federal Deposit Insurance Corp. v. Municipio de San Juan, ante, a la pág. 391; Las Piedras Const. Corp. v. Municipio de Dorado, ante, a la pág. 1021-1022.

Ahora bien, hemos señalado que el antes mencionado poder impositivo municipal puede ser ejercido sólo "sobre materias no incompatibles con la tributación impuesta por el estado". Café Rico, Inc. v. Municipio de Mayagüez, ante; véase, además, Levy, Inc. v. Municipio de Manatí, ante, a la pág. 300; Federal Deposit Insurance Corp. v. Municipio de San Juan, ante, a la pág. 391.

En virtud de lo anterior, "la Asamblea Legislativa ha aprobado varias leyes que regulan la facultad municipal para recaudar impuestos". Levy, Inc. v. Municipio de Manatí, ante. Entre ellas encontramos la Ley de Municipios Autónomos del Estado Libre Asociado de Puerto Rico, Ley Núm. 81 del 30 de agosto de 1991, 21 L.P.R.A. § 4001 *et seq.*, en adelante Ley de Municipios Autónomos[9], a través de la cual la legislatura autorizó a los municipios a imponer y cobrar varias contribuciones, derechos, arbitrios e impuestos razonables dentro de sus límites territoriales. Art. 2.002 Ley de Municipios Autónomos, 21 L.P.R.A. § 4052(d); Levy, Inc. v. Municipio de Manatí, ante, a la pág. 300.

---

[9] La Ley de Municipios Autónomos, ante, derogó la Ley Núm. 146 de 18 de junio de 1980, según enmendada, mejor conocida como la Ley Orgánica de Municipios.

A través de los años la Asamblea Legislativa ha ampliado las facultades contributivas de los municipios. De particular relevancia al caso ante nos es la Ley Núm. 199 de 6 de septiembre de 1996, en adelante Ley Núm. 199. Mediante la referida pieza legislativa la Legislatura autorizó, expresamente, a los municipios a cobrar arbitrios sobre actividades de construcción, realizadas dentro de sus límites territoriales. Exposición de Motivos Ley Núm. 199.

El antes mencionado estatuto tuvo la intención de aclarar grandes lagunas legislativas existentes en torno a la referida autoridad. De este modo, la Asamblea Legislativa se dio a la tarea de definir con mayor claridad el alcance y limitaciones de la facultad otorgada a los municipios para imponer los referidos arbitrios. Exposición de Motivos Ley Núm. 199. véase, además, Río Construction Corp. v. Municipio de Carolina, res. el 16 de marzo de 2001, 2001 T.S.P.R. 36.

La referida pieza legislativa estableció, entre otras cosas, los procedimientos para la determinación de este arbitrio, su imposición, exenciones, reclamaciones, reembolsos y las sanciones administrativas y penales. Para lograr los propósitos de la medida se establecieron tres términos fundamentales, a saber; *arbitrio de*

*construcción*[10], *contribuyente*[11] *y actividad de construcción.*

Particularmente, al definir el concepto *actividad de construcción*, la Legislatura precisó el tipo de actos o actividades que serían objeto del arbitrio de construcción. Artículo 1.003 (cc) de la Ley Núm. 199. Específicamente, se dispuso que se <u>excluía</u> del pago del

---

[10] Este término estableció el tipo de actividad de construcción sobre la cual recaería la contribución que impondrá el municipio, establecido mediante ordenanza, dentro de sus límites territoriales. Art. 1.003 (bb) de la Ley Núm. 199. <u>Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al proyecto 1938</u>, del 8 de mayo de 1996, pág. 21-22. A su vez, el referido concepto clarificó que la imposición de un arbitrio de construcción constituiría un acto separado y distinto que no privaba o limitaba la facultad de los municipios o del Estado de imponer otras contribuciones, arbitrios, impuestos, licencias, derechos, tasas y tarifas; y que la facultad de los municipios y el Estado de imponer contribuciones sobre el mismo objeto, como lo es la actividad de construcción, no representa una doble tributación. <u>Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al proyecto 1938</u>, del 8 de mayo de 1996, pág. 21-22. La referida aclaración se incluyó en virtud de dos decisiones de Este Tribunal; a saber, <u>Las Piedras Construction</u> v. <u>Municipio de Dorado</u>, 134 D.P.R. 1018 (1994) y <u>Nogama Construction Corp.</u> V. <u>Municipio de Aibonito</u>, 136 D.P.R. 146 (1994), donde determinamos que unos impuestos municipales eran ilegales, toda vez que su imposición constituía una doble tributación no permitida clara y explícitamente por ley.

[11] Al definir el concepto *contribuyente* se delimitaron claramente las respectivas responsabilidades de dos personas naturales o jurídicas distintas con respecto al pago del arbitrio de construcción. A saber se estableció la responsabilidad del dueño que ejecuta directamente las labores de administración y/o ejecución de la obra de construcción; y la de persona que es contratada para llevar a cabo la obra. Artículo 1.003 (dd) de la Ley Núm. 199. <u>Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de Representantes con respecto al proyecto 1938</u>, del 8 de mayo de 1996, pág. 22.

arbitrio de construcción todo acto o actividad que no requiriera un permiso de construcción expedido por la Administración de Reglamentos y Permisos. Artículo 1.003 (cc) Ley Núm. 199; véase, además, Río Construction Corp. v. Municipio de Carolina, ante.

Aun cuando la referida disposición no hacía mención alguna de que dicha exención se extendía a las entidades privadas que hacían negocios de construcción u otros similares con organismos gubernamentales, surgieron problemas debido a que se podía interpretar que la misma podría incluir obras de carácter público realizadas por entidades privadas contratadas o subcontratadas para esos fines. En virtud de lo anterior, en el año 1998 la Asamblea Legislativa aprobó dos enmiendas a la Ley de Municipios Autónomos para aclarar la intención legislativa consignada mediante la aprobación de la Ley Núm. 199, la cual consistía en imponer arbitrios de construcción a toda actividad u obra de construcción realizada dentro de los límites de un municipio por una persona natural o jurídica privada. Exposición de Motivos Ley Núm. 130, del 17 de julio de 1998 y Exposición de Motivos Ley Núm. 323, del 24 de diciembre de 1998; véase, además, Río Construction Corp. v. Municipio de Carolina, ante.

La primera de dichas enmiendas fue la Ley Núm. 130, ante, en adelante Ley Núm. 130. Específicamente, el referido estatuto fue aprobado con la intención de reafirmar la facultad cedida por Ley a los municipios para

sufragar los servicios que otorgan a sus ciudadanos y para
asegurar que todo contratista que realice una obra pública
del Gobierno Central, Municipal o Federal, pague el
arbitrio de construcción correspondiente en el municipio
en donde se lleva a cabo dicha obra, previo al comienzo de
la misma. Exposición de Motivos Ley Núm. 130.[12]

En segundo término, la legislatura aprobó la Ley Núm.
323, ante, en adelante Ley Núm. 323.[13] La misma estableció

---

[12] A esos efectos, se enmendó el inciso (d) del artículo
2.002 de la ley de Municipios Autónomos, donde se dispone
la facultad de los municipios para imponer contribuciones,
tasas, tarifas y otras. Específicamente se dispuso, en lo
aquí pertinente, lo siguiente:

"Toda obra de construcción dentro de los límites
territoriales de un municipio, realizada por una
persona natural o jurídica privada, o que sea
llevada a cabo por una persona natural o jurídica
privada a favor o en representación de, o por
contrato o subcontrato suscrito con una agencia o
instrumentalizad del gobierno central o Municipal
o del Gobierno Federal, incluyendo aquella obra
que no requiera la solicitud o expedición de un
permiso por la Administración de Reglamentos y
Permisos o por un municipio autónomo, deberá
pagar arbitrio de construcción correspondiente,
previo al comienzo de dicha obra."

[13] A esos fines, se enmendó la definición de *actividad de
construcción*. Se estableció, en lo aquí pertinente, lo
siguiente:

"Se exime del pago de arbitrio de construcción
las obras que realice por administración una
agencia del Gobierno Central o sus
instumentalidades, una corporación pública, un
municipio o una agencia del gobierno federal. No
obstante, esta exención no aplica…cuando se
trate de obras de construcción llevadas a cabo
por una persona natural o jurídica privada,
actuando a favor o en representación de o por
contrato o subcontrato suscrito con una agencia
del gobierno federal, cuando las leyes o

(Continúa . . .)

la aplicación retroactiva sobre cualquier determinación e imposición de arbitrio de construcción emitida bajo las disposiciones de la Ley Núm. 199 de 6 de septiembre de 1996.

Cónsono con lo anterior, en el presente caso, y de conformidad con la anterior autorización, el Municipio de Ceiba aprobó[14] la Ordenanza Municipal Núm. 8, Serie 1991-1992. Posteriormente y para derogar y sustituir la antes mencionada ordenanza, aprobó la Ordenanza Núm. 33, Serie 1997-1998. Mediante las mismas el referido Municipio reglamentó lo concerniente a la imposición y cobro de arbitrios por concepto de construcciones, reconstrucciones, relocalizaciones, mejoras, instalaciones, obras de infraestructura y cualquier otra obra, dentro de los límites territoriales del municipio.

Al amparo de las mismas, el Municipio de Ceiba, *prima facie*, tenía facultad para imponer el arbitrio de construcción por las obras realizadas por HBA dentro de sus límites territoriales, no obstante la referida entidad haber sido contratada por el Departamento de Defensa de los Estados Unidos. Ahora bien, debemos determinar si dicha facultad impositiva aplicaba a construcciones

_____

reglamentos federales aplicables así lo permitan."

[14] Conforme a la Ley de Municipios Autónomos, según enmendada, todo arbitrio de construcción "tiene que ser impuesto por los municipios a través de una ordenanza municipal aprobada por dos terceras (2/3) partes para ese fin". Artículo 1.003 (cc), 21 L.P.R.A. § 4001 (cc).

realizadas dentro de terrenos federales de la Base Naval Roosevelt Roads, toda vez que en los referidos terrenos existía jurisdicción exclusiva federal.

## II

La Asamblea Legislativa de Puerto Rico, mediante la aprobación de la Ley 16 de febrero de 1903 en sus Secciones 5 y 6, mejor conocida como la "Ley Autorizando al Gobernador de Puerto Rico para Traspasar Ciertos Terrenos a los Estados Unidos para Fines Navales o Militares y para Otros Fines Públicos", dio su consentimiento a los Estados Unidos para adquirir terrenos en nuestra Isla para fines navales y militares y otros fines públicos, y se dispuso que al así hacerlo cesaría la jurisdicción de Puerto Rico sobre los mismos.[15] Roberts v. U.S.O. Council of Puerto Rico, 145 D.P.R. 58, 65 (1998).

---

[15] El texto original de las disposiciones pertinentes de la Ley de 16 de febrero de 1903, ante, establecían, en lo pertinente, lo siguiente:

> Sección 5.--Que se dé y por la presente se d[a], el consentimiento [a] los Estados Unidos para adquirir, para fines navales [o] militares [u] otros fines públicos, por compra [o] expropiación forzosa, cualesquiera terrenos en la Isla de Puerto Rico, y cuando fuesen adquiridos en esta forma, y los Estados Unidos hayan tomado posesión de los mismos, toda jurisdicción sobre tales terrenos por parte de "El Pueblo de Puerto Rico" cesará y terminará ipso facto. Disponiéndose no obstante que, si subsecuentemente los Estados Unidos enajenaren cualquiera [o] todas las tierras adquiridas en esta forma, El Pueblo de Puerto Rico volverá a tener jurisdicción sobre las mismas.

(Continúa . . .)

Este Tribunal ha tomado conocimiento judicial del hecho de que la Base Naval Roosevelt Roads, lugar donde se llevaron a cabo las obras de construcción objeto del presente caso, fueron adquiridas por el gobierno federal antes de 1955. Roberts v. U.S.O. Council of Puerto Rico, ante a la pág. 65; Capitol v. Srio. de Hacienda, 82 D.P.R. 326, 329-330 (1963). Hemos señalado que la jurisdicción de Puerto Rico cesó desde entonces y corresponde exclusivamente a los Estados Unidos.[16] *Ibid*. En virtud de

_____

> Sección 6.--Que la jurisdicción exclusiva sea y es por la presente cedida [a] los Estados Unidos sobre cualquiera y todas las tierras que puedan en adelante adquirir en la Isla de Puerto Rico por compra [o] expropiación forzosa.... 1903 Leyes de Puerto Rico 114.

En 1955, a través de la aprobación de la Ley Núm. 63 de 10 de junio de 1955, 28 L.P.R.A. § 46, la antes mencionada sección 5 de la Ley de 16 de febrero de 1903 fue derogada y la sección 6 fue enmendada. No obstante lo anterior, las mismas son de aplicación al presente caso, toda vez que los terrenos donde está localizada la Base Naval Roosevelt Roads fueron cedidos a los Estados Unidos antes de 1955. Roberts v. U.S.O. Council of Puerto Rico, ante a la pág. 64-65.

[16] Mediante la Ley Núm. 62 de 10 de junio de 1955, 28 L.P.R.A. § 54 *et. seq.*, se alteró el esquema anterior, puesto que en lugar de concederse jurisdicción exclusiva automáticamente a Estados Unidos como ocurría en virtud de la Ley de 16 de febrero de 1903, ante, una vez éstos la solicitaran, mediante la nueva ley el Estado Libre Asociado de Puerto Rico mantiene jurisdicción sobre dichos terrenos, salvo que la misa sea cedida en la forma prevista por el artículo 2; es decir, si "el Gobernador del Estado Libre Asociado de Puerto Rico,…creyere conveniente para los mejores intereses del Estado Libre Asociado…sujeto a las condiciones que se estipulan [en esta ley] y a las demás condiciones que estime convenientes. La jurisdicción sobre tales terrenos por parte del Estado Libre Asociado de Puerto Rico, continuará, sin embargo, hasta que el indicado funcionario

(Continúa . . .)

lo anterior, para que proceda una imposición contributiva local dentro de los terrenos de jurisdicción federal exclusiva de la Base Naval Roosevelt Roads, el Congreso de los Estados Unidos tiene que haberlo autorizado expresamente mediante estatuto. Véase: Capitol Construction v. Srio. De Hacienda, ante a la pág. 332.[17]

Mediante la Ley Buck, ante, el Congreso de los Estados Unidos le concedió el poder a los estados, posesiones o territorios, incluyendo a Puerto Rico[18], para legislar sobre el cobro de "contribuciones sobre ingreso" por las actividades llevadas a cabo en una jurisdicción o enclave federal[19]. Puerto Rico Drydock & Marine Terminals,

_____

haya aceptado, en representación de Estados Unidos, la cesión de jurisdicción y haya radicado en la Oficina del Gobernador una notificación a tal efecto". 28 L.P.R.A. § 55. Roberts v. U.S.O. Council of Puerto Rico, ante a la pág. 65.

[17] En Capitol, ante, nos enfrentamos a una controversia un tanto distinta a la que se plantea en el presente caso. En dicho caso se cuestionó la validez de la imposición de una contribución sobre la propiedad mueble --equipos de construcción, enseres y herramientas-- de un contratista que realizaba trabajos de construcción en bases militares de los Estados Unidos en Puerto Rico --Ramey Fields y Roosevelt Roads-- propiedad mueble que se hallaba ubicada en dichas instalaciones militares. Resolvimos que no era procedente dicha contribución ya que Puerto Rico carecía de autoridad o facultad impositiva para así hacerlo.

[18] Para fines de la Ley Buck, ante, el concepto *estado* incluye cualquier territorio o posesión de los Estados Unidos. 4 U.S.C.A. § 110 (e).

[19] El Tribunal Supremo de los Estados Unidos ha señalado que los Estados pueden en virtud de su absoluta discreción crear entidades gubernamentales --tales como condados o ciudades-- para que lleven a cabo los poderes gubernamentales que le han sido delegados. Wisconsin Public Intervenor v. Portier, 501 U.S. 597, 608-609
(Continúa . . .)

Inc. v. Srio. De Hacienda, 82 D.P.R. 658, 663 (1961); véanse, además, U.S. v. Lewiburg Area School District, 539 F. 2d 301, 309 (3rd Cir., 1976); General Dynamics Corp. v. Bullock, 547 S.W. 2d 255 (1976), City of Portsmouth v. Fred C. Gardener Co. Inc., 211 S.E. 2d 259 (1975); Humble Oil and Refining Co. v. Calvert, 478 S.W. 2d 926 (1972); Alaska v. Baker, 390 P. 2d 1009(1964).

En virtud del antes mencionado estatuto, entre otras cosas, los estados están autorizados a cobrar impuestos en enclaves federales [20] siempre que se trate de "contribuciones sobre ingresos". 4 U.S.C.A. § 106. A tales efectos, la Ley Buck define el término "contribución sobre ingreso" como cualquier contribución que se imponga sobre,

_____

(1991); Sailors v. Board of Education of the Kentucky of County, 387 U.S. 105, 108 (1967) citando a Reynolds v. Sims, 377 U.S. 533 (1964) y Hunter v. Pittsburg, 207 U.S. 161 (1907). En virtud de lo anterior, los municipios tiene la potestad de llevar a cabo las facultades que le otorga a Puerto Rico la Ley Buck.

[20] La sección 106 de la Ley Buck, ante, establece en lo aquí pertinente que:

> (a) No person shall be relieved from liability for any income tax levied by any State, or by any duly constituted taxing authority therein, having jurisdiction to levy such a tax, by reason of his residing within a Federal area or receiving income from transactions occurring or services performed in such area; and such State or taxing authority shall have full jurisdiction and power to levy and collect such tax in any Federal area within such State to the same extent and with the same effect as though such area was not a Federal area.

con respecto a, o que se mida por el ingreso neto, el ingreso bruto o las entradas brutas. 4 U.S.C.A. § 110(c).[21]

Varios tribunales, tanto federales como estatales, han destacado que el Congreso de los Estados Unidos, al aprobar la Ley Buck, tuvo la intención de definir el concepto *"contribución sobre ingresos"* dentro de un marco amplio y abarcador. Véase: U.S. v. City & County of Denver, 573 F. Supp. 686, 691-692 (1983); U.S. v. Lewiburg Area School District, ante; City of Portsmouth v. Fred C. Gardener Co. Inc., ante, Humble Oil and Refining Co. v. Calvert, ante. A esos efectos, resulta ilustrativo el Informe del Comité de Finanzas del Senado, en el cual se estableció que:

> This definition (of income tax) …must of necessity cover a broad field because of the great variations to be found between the different State laws. The intent of your committee in laying down such a broad definition was to include therein any State tax (whether known as a corporate-franchise tax, or business privilege tax, or any other name) if it is levied on, with respect to, or measured by net income, gross income, or gross receipts. (Énfasis nuestro). Report of the Senate Finance Committee of May 16, 1940, pág. 5; 76th Congress, 3rd. Session; Report No. 1625, Calendar No. 1692. *Ibid.*

---

[21] Específicamente, la sección 110(c) establece lo siguiente:

> The term "income tax" means any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts. (Énfasis nuestro).

Como vemos, no hay duda que al aprobar esta Ley el Congreso tuvo la clara intención de darle una definición amplia al antes mencionado concepto, aunque no estableció un listado sobre qué tipo de impuestos están incluidos dentro del concepto "contribución sobre ingresos", según definido por la Ley Buck. Examinamos la jurisprudencia federal y estatal con el propósito de delimitar el alcance y el significado del concepto contribución sobre ingresos.

El Tribunal Supremo de los Estados Unidos ha establecido que la determinación respecto a si un tributo impuesto por un estado, territorio o posesión es una *contribución sobre ingresos,* al amparo de las disposiciones de la Ley Buck, es un cuestión federal y no estatal. Véase: Howard v. Commissioners of the Sinking Fund of City of Louisville, 344 U.S. 624, 629 (1953).

Específicamente, en Howard v. Commissioners of Sinking Fund of the City of Louisville, ante, el referido Tribunal se enfrentó a la controversia de si era válido un arbitrio impuesto por la ciudad de Louisville, Kentucky sobre unos empleados en un enclave federal.[22] El referido arbitrio se cobraba anualmente por el privilegio de trabajar en la ciudad y, a su vez, se calculaba a base del uno por ciento (1%) de (a) todos los salarios, jornales o

---

[22] El enclave federal era una fábrica militar, sita en unos terrenos que el gobierno de los Estados Unidos había adquirido, con el consentimiento de la Legislatura de Kentucky desde 1940. En virtud de ello, el gobierno de los Estados Unidos tenía jurisdicción exclusiva sobre el área.

comisiones generados en la ciudad, y (b) de las ganancias netas ("net profits")[23] de todos los negocios llevados a cabo en la ciudad.

Una mayoría de los integrantes del referido Foro federal enfatizó que la interrogante a resolver era si el arbitrio en cuestión era una *contribución sobre ingresos* dentro de la definición de la Ley Buck. A esos efectos, se expresó lo siguiente:

> Was this tax an 'income tax' within the meaning of the Buck Act? In a prior case, Kentucky had held this tax was not an 'income tax' within the meaning of the Constitution of Kentucky but was a tax upon the privilege of working within the City of Louisville. But the right to tax earnings within the area was not given Kentucky in accordance with the Kentucky law as to what is an income tax. The grant was given within the definition of the Buck Act, and this was for *any* tax measured by net income, gross income, or gross receipts. In the instant case, the Kentucky Court of Appeals correctly stated that the question was whether the tax was an income tax within the meaning of the federal law. (Citas omitidas)(Énfasis nuestro). A las págs. 628-629.

La Mayoría del mencionado Tribunal determinó que el arbitrio objeto del litigio era una *"contribución sobre ingresos"* al amparo del significado de la Ley Buck, por lo cual podía ser válidamente impuesto por la ciudad.[24]

---

[23] "Net profits" se traduce al español como ganancias netas. Steven M. Kaplan, Wiley's English-Spanish, Spanish-English, Bussiness Dictionary, 1996, pág. 178.

[24] Por otro lado, el Juez Douglas disintió del antes mencionado resultado--opinión con la cual el Juez Douglas concurrió. Señaló que el arbitrio en este caso era por sus propios términos un impuesto pagadero para una licencia

(Continúa . . .)

En Jefferson v. Acker, 527 U.S. 423 (1999), el Condado de Jefferson, Alabama[25], instó una acción contra unos jueces de distrito federal que se negaban a pagar un impuesto a ocupaciones ("occupational tax")[26], bajo el fundamento de que el mismo violaba la doctrina de inmunidad contributiva intergubernamental.

El impuesto, según definido por la Ordenanza del Condado, se imponía a cualquier persona que estuviese trabajando en la ciudad, a la cual de otra manera no se le requiere el pago de un impuesto pagadero para una licencia ("license fee"). Es decir, el impuesto se imponía por el derecho de trabajar en la ciudad. A su vez, el impuesto tenía que <u>ser pagado antes de realizar la profesión,</u> <u>ocupación, oficio, o vocación y antes de devengar ingreso</u>

("license fee") impuesto sobre el privilegio de realizar ciertas actividades. Conforme a ello, argumentó que:

> The tax is narrowly confined to salaries, wages, commissions and to the net profits of businesses, professions, and occupations. Many kinds of income are excluded, e.g., dividends, interests, capital gains. The exclusions emphasize that the tax is on the privilege of working or doing business in Louisville. A la pág. 629.

[25] Precisa señalar que Alabama no había autorizado a sus condados a recaudar contribuciones sobre ingresos. No obstante, los había autorizado a imponer impuestos pagaderos para una licencia ("license or privilege tax"). En virtud de esa autorización, el condado de Jefferson aprobó la ordenanza de la cual surge el impuesto en controversia.

[26] "Occupational tax" se traduce al español como impuesto a ocupaciones o licencia fiscal. Steven M. Kaplan, <u>Wiley´s English-Spanish, Spanish-English, Bussiness Dictionary,</u> 1996, pág. 184.

alguno, debido a que era ilegal realizar las antes mencionadas actividades sin pagar el correspondiente impuesto. La referida Ordenanza, incluso, imponía sanciones a toda persona que incumpliera con lo dispuesto en la misma. Específicamente, el impuesto se calculaba a base del medio por ciento (1/2%) de todos los ingresos brutos o entradas brutas ("gross receipts") del contribuyente, concepto que la ordenanza definió como compensación, salarios, jornales, comisiones y/o bonos.

El estatuto federal aplicable a la controversia era el "Public Salary Tax Act", 4 U.S.C.A. § 111 [27]. Específicamente, el Tribunal Supremo de los Estados Unidos tuvo que determinar, entre otras cosas y en lo aquí pertinente, si el impuesto en cuestión constituía una contribución sobre ingresos, toda vez que el aludido estatuto federal sólo autorizaba a la imposición de contribuciones sobre paga o compensación.

---

[27] A través de esta pieza legislativa el Congreso autorizó a los Estados a cobrar contribuciones no discriminatorias a los empleados federales. Específicamente, la Sección 111 establece lo siguiente:

> "The United States consents to the taxation of pay or compensation for personal service as an officer or employee of the United States, a territory or possession or political subdivision thereof, the government of the District of Columbia, or an agency or instrumentality of one or more of the foregoing, by a duly constituted taxing authority having jurisdiction, if the taxation does not discriminate against the officer or employee because of the source of the pay or compensation."

Una Mayoría de los integrantes del Tribunal Supremo federal acudió, por analogía, a lo resuelto en Howard --al amparo de la Ley Buck-- para establecer que en efecto el impuesto en cuestión era una "contribución sobre ingresos". A tales efectos, la Mayoría indicó que la contribución objeto del litigio en Howard, ante, era similar en aspectos relevantes al impuesto de Jefferson. Específicamente, destacó que en Howard se determinó que un impuesto pagadero para una licencia ("license fee") era una contribución sobre ingresos para los fines de la Ley Buck, aun cuando se desviaba de lo que usualmente era una contribución sobre ingresos. A esos efectos, se expresó que:

> In *Howard v. Commissioners of Sinking Fund of Louisville,* 344 U.S. 624, 73 S.Ct. 465, 97 L.Ed. 617 (1953), the Court held that a "license fee" similar in relevant respects to Jefferson County's was an "income tax" for purposes of a federal statute that defines "income tax" as "any tax levied on, with respect to, or measured by, net income, gross income, or gross receipts," 4 U.S.C. § 110(c). The Court so concluded even though the local tax was styled as "a tax upon the privilege of working within [the municipality]," was not an "income tax" under state law, and deviated from textbook income tax characteristics. (citas omitidas) (Énfasis nuestro). A la pág. 438.

Es de notar que el referido Tribunal acudió a lo resuelto en Howard para determinar que el impuesto pagadero para una licencia ("license fee") era un método de recaudación de ingresos, sin tener un propósito regulador sobre las profesiones u ocupaciones. A esos efectos se expresó que:

> Alabama's enabling Act does not allow its counties to so provide; those otherwise subject to license or privilege taxes under Alabama's laws may not be reached by a county's occupational tax. See 1967 Ala. Acts 406, § 4. The dispositive measure, however, is the Public Salary Tax Act, <u>which does not require the local tax to be a typical "income tax." Just as the statute in Howard consented broadly to <em>"any tax measured by net income, gross income, or gross receipts</em>,"</u> 344 U.S., at 629, 73 S.Ct. 465, the Public Salary Tax Act consents to any tax on "pay or compensation," which Jefferson County's surely is. The sole caveat is that the tax "not discriminate ... because of the [federal] source of the pay or compensation," 4 U.S.C. § 111.(Énfasis nuestro)a las págs. 441-442.

<u>En conclusión</u>, el Tribunal Supremo de los Estados Unidos ha avalado una definición, <u>amplia y abarcadora</u>, del concepto contribución sobre ingresos, con la consecuencia de que impuestos que usualmente no son considerados como contribuciones sobre ingreso, a la luz de la definición común de lo que significa el referido término, están cobijados por la autorización amplia contenida en la Ley Back.[28]

_____

[28] En este caso, el Juez Breyer disintió exponiendo cuatro razones por las cuales consideraba que el impuesto en controversia era uno impuesto pagadero por una licencia ("license fee"), la Juez O´Connor se unió a lo esbozado en la misma. De esta forma, señaló que el mismo era inconstitucional toda vez que lo único que permitía el "Public Salary Act" era la imposición de una contribución sobre ingresos. A esos efectos, y en lo pertinente al caso ante nos, primeramente señaló que el lenguaje y la estructura y propósito de la ordenanza indicaban que lo que se imponía era un cargo por llevar a cabo una actividad y no una contribución sobre ingresos. Específicamente, señaló que el propósito de la Ordenanza era establecer un impuesto por el privilegio de llevar a cabo una actividad dentro de la ciudad. De igual forma, indicó que el lenguaje de la Ordenanza se expresa en términos de una condición que se impone por trabajar, y

(Continúa . . .)

Dicho curso decisorio ha sido reiterado en decisiones de varios tribunales, tanto estatales como federales, que han determinado que ciertos impuestos que tradicionalmente no son considerados como contribuciones sobre ingresos, están cobijadas por la definición amplia y abarcadora que de ese término dispone la Ley Buck. Veamos.

En Alaska v. Baker, ante, el Tribunal Supremo de Washington sostuvo la validez de un estatuto [29] que autorizaba la imposición de un impuesto pagadero para una licencia de negocios ("bussines license tax") [30] a unos contratistas independientes que trabajaron dentro de una reserva militar en Alaska, mediante contratos con el gobierno de los Estados Unidos. El referido foro determinó lo anterior, aun cuando todos los trabajos fueron realizados exclusiva y completamente dentro de la aludida

---

una contribución que se impone sobre ingresos. Segundo indicó que según era calculado el impuesto, es más un impuesto pagadero por una licencia ("license fee") que una contribución sobre ingresos. Específicamente señaló que la razón por la cual se imponía el impuesto no era por ingresos devengados sino por desempeñar cierto trabajo. Tercero argumentó que existían muchas excepciones al impuesto, lo cual sólo tenía sentido si la contribución era parte de un esquema estatal de imposición de impuestos pagaderos para licencias. Por último, alegó que la ordenanza de Jefferson imponía cargas directamente sobre el gobierno federal que limitadamente exceden aquellos impuestos por una contribución sobre ingreso estatal o local.

[29] La pieza legislativa en controversia era el "Alaska Bussiness Tax Act", título 43, Alaska Statutes, § 43.70.010 et seq.

[30] "License tax" se traduce al español como impuesto pagadero para una licencia. Steven M. Kaplan, Wiley´s English-Spanish, Spanish-English, Bussiness Dictionary, 1996, pág. 154.

reserva y el impuesto tenía que ser pagado previo al comienzo de la obra.

Luego de indicar que la interrogante principal en el caso era si el estatuto en cuestión estaba dentro del alcance de la Ley Buck, el referido foro estatal --citando a Howard y destacando que la medida de Alaska no era significativamente diferente a la que estaba en controversia en el aludido caso-- determinó que el impuesto en cuestión era una *contribución sobre ingresos* para los fines del referido estatuto federal. Cónsono con ello, concluyó que era válido el estatuto, ya que el mismo era básicamente un método de recaudación de ingresos permitido por la Ley Buck y no una medida regulatoria.

En Humble Oil and Refining Co. v. Calvert, ante, el Tribunal Supremo de Texas se enfrentó, en lo aquí pertinente, a la interrogante de si el estado de Texas estaba autorizado --al amparo de la Ley Buck-- a cobrar un impuesto sobre una compañía que, por un arrendamiento con el gobierno de los Estados Unidos, extraía petróleo o gas dentro de un enclave federal[31]. El impuesto en cuestión era denominado según el estatuto de Texas como un impuesto a ocupaciones ("occupational tax") por llevar a cabo la antes mencionada actividad dentro de la ciudad. El mismo se calculaba a base del valor en el mercado del mineral,

---

[31] Específicamente, el enclave federal era la Base Naval Corpus Christi. En 1940 el gobernador de Texas cedió la jurisdicción exclusiva del referido terreno al gobierno de los Estados Unidos.

no importando si el gas o el petróleo hubiesen sido
vendidos, utilizados o simplemente descartados.

El referido foro estatal, luego de destacar que
había sido la intención del Congreso al aprobar la Ley
Buck definir ampliamente el concepto *contribución sobre
ingresos*, señaló lo siguiente:

> The Buck Act 'income tax,' broadly defined as it
> is, refers to the broad generic class of taxes
> upon income. It does not require that the tax be
> denominated an income tax or that it conform to
> the federal income tax. If the tax in question
> is based upon income and is measured by that
> income in money or money's worth, as a net
> income tax, gross income tax, or gross receipts
> tax, it is an 'income tax.'(Énfasis nuestro). A
> la pág. 930.[32]

---

[32] Indicó, además, con respecto a qué podía ser considerado
como una *contribución sobre ingresos* añadió lo siguiente:

> "We are here dealing with a particular statutory
> definition of an 'income tax' in a particular
> context, and not with any sort of common
> understanding of an 'income tax.' 'Income
> taxes,' or taxes on income, describe a generic
> class of taxes in which the base or measure is
> income … A particular 'income tax' may, of
> course, define its base more narrowly and
> selectively than the broadest definition of
> income. A particular income tax may select
> different points in time at which the income
> will be recognized, such as the time of sale,
> time of receipt, time of manufacture or
> production, etcetera. Whatever these
> differences, however, the tax does not cease to
> be an income tax". (Énfasis nuestro). A la pág.
> 929.

A su vez, con respecto al término ingreso el referido foro
destacó lo siguiente:

> 'Income' is variously described as the flow of
> goods, services, property or other wealth during
> a definite period of time. It may be considered
> as the money, or money's worth, which comes
> during a definite period. It is to be
> distinguished from capital, which is a fund of

(Continúa . . .)

El mencionado foro indicó que, <u>independientemente de la denominación que se le pudiera dar a un impuesto, si el referido impuesto se medía a base a los ingresos recibidos era una *contribución sobre ingresos* al amparo de la Ley Buck</u>. A esos efectos, y reafirmando a la decisión emitida por el Tribunal Supremo federal en <u>Howard</u>, ante expresó:

> Over the dissent of Justices Douglas and Black, the Court held that it did not matter that the tax involved was not an 'income tax' by Kentucky law. <u>It emphasized that the Buck Act definition applied to Any tax, and the word 'any' was italicized in the Court's opinion</u>. If Any tax came within the Buck Act's Definition of income tax, it was permissible to the State. Since the tax there involved was measured by, and levied with respect to, the income from the taxed activity, it was a Buck Act income tax even though not denominated or classified as an income tax under local law. a la pág. 931.

En <u>City of Portsmouth</u> v. <u>Fred C. Gardener Co. Inc.</u>, ante, el Tribunal Supremo de Virginia resolvió que la ciudad de Portsmouth podía válidamente cobrarle un impuesto pagadero por una licencia de negocios ("business license tax") a un contratista que edificó unas mejoras en una reserva militar, por medio de un contrato de ejecución de obra con el gobierno de los Estado Unidos. Específicamente, el impuesto se cobraba por llevar a cabo,

---

> wealth at a particular time. See Seligman, Income Tax, 7 Encyclopedia of the Social Sciences 628--631 (1932). <u>The essence of income is an inflow constituting an accretion to wealth, identifiable and measurable in money or money's worth, though not necessarily in cash.</u> (Énfasis nuestro) *Ibid*.

entre otras cosas, negocios, ocupaciones y oficios. El aludido impuesto se calculaba a base de los ingresos o entradas brutas ("gross receipts") del negocio del contratista.

Al resolver la controversia ante sí, el referido foro indicó, entre otras cosas, que el Tribunal Supremo de los Estados Unidos ya había resuelto una controversia similar en Howard. De este modo, enfatizó que para establecer si el arbitrio en cuestión era una contribución sobre ingresos, tenía que acudir a la definición provista por la Ley Buck. A esos efectos, citando a Humble, señaló que:

> The Buck Act 'income tax,' broadly defined as it is, refers to the broad generic class of taxes based upon income. It does not require that the tax be denominated an income tax or that it conform to the federal income tax. If the tax in question is based upon income and is measured by that income in money or money's worth, as a net income tax, gross income tax, or gross receipts tax, it is an income tax. (Énfasis nuestro). A la pág. 262.

Nuevamente, en General Dynamics Corp. V. Bullock, ante, el Tribunal Supremo de Texas se enfrentó a la interrogante de si el estado podía válidamente imponer un impuesto sobre franquicias ("franchise tax") [33] a General

---

[33] "Franchise tax" se traduce al español como impuesto sobre franquicias, impuesto corporativo o derecho de licencia. Steven M. Kaplan, Wiley's English-Spanish, Spanish-English, Bussiness Dictionary, 1996, pág. 118.

Dynamic, una corporación privada[34] que llevaba a cabo su negocio primordialmente en un enclave federal en Texas.[35]

Específicamente, la controversia surgió debido a que el estado de Texas catalogó los ingresos brutos ("gross receipts") de la corporación dentro del enclave como ingresos obtenidos en Texas. El estado de Texas adujo que la Ley Buck había autorizado el cobro de contribuciones sobre ingreso en actividades de negocios --como las que realizaba General Dynamic-- dentro de enclaves federales.

En virtud de la intención del Congreso al aprobar la Ley Buck y por los fundamentos expresados en Humble, el referido foro estatal determinó que el impuesto era una contribución sobre ingresos a los fines de la Ley Buck, toda vez que el impuesto en cuestión podía ser visualizado como una contribución impuesta por el beneficio económico de llevar a cabo negocios en el estado. A esos efectos expresó:

> Under the analysis in Humble Oil & Refining Company v. Calvert, supra, the granting of the privilege to transact business in the State of Texas represents the realization of gross income to the General Dynamics Corporation because an economic benefit flows to the Corporation. These economic benefits which flow from the granting of the privilege include the opportunity to transact intrastate business and the right to invoke the protection of the local government.

---

[34] General Dynamics estaba primordialmente dedicada a la manufactura y venta de suministros y equipos para defensa.

[35] Específicamente, el enclave federal se encontraba en el condado de Tarrant dentro del Estado de Texas, el mismo era conocido como "Air Force Plant No.4". El aludido terreno fue arrendado a General Dynamic por el gobierno federal.

The formula used in the franchise tax is the valuation of the privilege granted by the Legislature. (Citas omitidas) (Énfasis nuestro). A la pág. 258.

Un año más tarde, en U.S. v. Lewiburg Area School District, ante, el Tribunal del Tercer Circuito de Apelaciones determinó que un distrito escolar podía imponer ciertas contribuciones locales a unos empleados federales y a sus familiares que residían en el enclave federal.[36] Uno de los impuestos era un impuesto ocupacional ("occupational tax") que se imponía a base de tres criterios. A saber:

> "one, by a levy of a fixed amount against each occupation, with the variation in the levy on each class based on a rough calculation of the average relative income of each occupation; second, by placing a value on each occupation and levying a millage rate against that value, the values being obtained from statistical evidence of the average income earned in each occupation; a third method is to assess each taxpayer's occupation by the yield of that taxpayer from his occupation in a certain number of prior years". A la pág. 310.

Al igual que en Humble, se indicó que el informe del Senado con respecto a la Ley Buck enfatizó que la definición de *contribución sobre ingresos* fue diseñada para cubrir una gran variedad de contribuciones debido a la gran variedad de contribuciones que existen en los

---

[36] El enclave federal era conocido como "Lewisburg Federal Penitentiary". En 1931 el referido enclave fue adquirido por los Estados Unidos con el consentimiento de la legislatura de Pensylvania, la cual consintió la adquisición y de igual forma cedió la jurisdicción sobre el terreno adquirido.

diferentes estados y que la intención de la comisión era incluir cualquier contribución del Estado, no importa cuál fuera su denominación. A su vez, el referido foro indicó, citando tanto a Howard, como a Humble y a City of Portsmouth, que en virtud del propósito de la Ley y de la amplia definición de *contribución sobre ingreso*, muchas contribuciones estatales que no eran denominadas como contribuciones sobre ingresos, y que no se ajustaban a la contribución sobre ingresos federal, habían sido consideradas como contribuciones sobre ingresos para fines de la Ley Buck.[37]

Surge de todo lo anteriormente expuesto que el término *"contribución sobre ingresos"*, al amparo de la Ley Buck, es uno amplio, abarcador y no circunscrito a lo que habitualmente se conoce como una contribución sobre ingresos. Esto es, contribuciones estatales son consideradas válidas, al amparo de la Ley Buck, aun cuando no hayan sido denominadas *contribuciones sobre ingresos* bajo el derecho estatal y aun cuando no sean calculadas, específicamente, conforme a lo que tradicionalmente se conoce como un ingreso.

---

[37] Específicamente, el referido foro señaló lo siguiente:

> In view of the purpose of the act and the broad definition of "income tax" found therein, many state taxes which are not denominated as income taxes and which do not conform to the federal income tax have been held to be income taxes for the purposes of the Buck Act. A la pág. 309.

III

En el presente caso, y conforme a la legislación vigente en Puerto Rico, el arbitrio de construcción debe pagarse al municipio donde se lleve a cabo dicha obra, previo a la fecha de su comienzo. Art. 2.002(d) Ley de Municipios Autónomos, 21 L.P.R.A. § 4052(d).

El referido arbitrio recae sobre el derecho de llevar a cabo una actividad de construcción y/o obra de construcción dentro de los límites territoriales del municipio. Art. 1.003 (cc) de la Ley de Municipios Autónomos, 21 L.P.R.A. § 4001 (cc). Específicamente, el antes mencionado arbitrio se impone sobre el costo total de la obra. Art. 2.002(d) Ley de Municipios Autónomos, ante.

El costo total de la obra se define como el costo en que se incurra para realizar el proyecto, luego de deducirle el costo de adquisición de terrenos, edificaciones ya construidas y enclavadas en el lugar de la obra, costos de estudios, diseños, planos, permisos, consultoría y servicios legales". Art. 2.002(d) Ley de Municipios Autónomos, 21 L.P.R.A. § 4052(d). De esta manera, se excluyeron partidas que no constituían una actividad directa de construcción y que ocurrían antes de comenzar la obra o construcción, evitando así una carga onerosa para el diseño de la obra antes de que la misma fuera realizada. Informe de la Comisión de Asuntos Municipales y de la Comisión de Hacienda de la Cámara de

Representantes con respecto al proyecto 1938, del 8 de
mayo de 1996, a la pág.22-23.

El referido arbitrio puede ser pagado por el dueño de
obra, si el mismo es el que está ejecutando la obra de
construcción, o por el contratista. Específicamente,
cuando es el contratista quien paga el referido arbitrio,
el mismo podrá "formar parte del costo de la obra". Art.
1.003 (ee), Ley de Municipios Autónomos, 21 L.P.R.A. §
4001 (ee).

Para poder determinar la cuantía del referido
arbitrio se multiplica el costo total de la obra por el
tipo contributivo o la tasa contributiva que corresponda,
según establecida por la ordenanza municipal
correspondiente. Art. 2.007(b)(1), Ley de Municipios
Autónomos, 21 L.P.R.A. § 4057(b)(1). Específicamente, en
este caso conforme a la Ordenanza Núm. 8, ante, cualquier
obra a la cual no le aplicara ninguna de las excepciones[38]

---

[38] Las excepciones son las siguientes:

(1)   Cuando la obra vaya a utilizarse como una
      residencia unifamiliar cuya construcción no sea parte
      de un proyecto de vivienda, de urbanización,
      condominio u otro proyecto de similar naturaleza cuyo
      costo total sea de $50,000 o menos, se pagará un
      arbitrio de $25 por cada $5,000 o fracción del costo
      de la obra. Disponiéndose, que los primeros $10,000
      estarán exentos del pago de arbitrios.
(2)   Cuando la obra a realizarse se trate de un
      establecimiento comercial o agrícola cuyo costo sea
      de $50,000 o menos, se le aplicará también el
      arbitrio y exención dispuesto en este subinciso; de
      ser más de $50,000 se le aplicará lo dispuesto en el
      inciso A.
(3)   Cuando la obra a realizarse se trate de
      reparaciones, ampliaciones, demoliciones,
                                          (Continúa . . .)

pagaría el dos y medio por ciento (2.5%) del costo total de la obra. 4ta Sección (a). A su vez, conforme a la Ordenanza Núm. 33, ante, pagaría, si no aplica ninguna de las excepciones[39], cuatro por ciento (4%) del costo total de la obra. 3ra sección (A).

_____

alteraciones y mejoras a un costo de $10,000 o más, las obras descritas en el párrafo B-1 de esta sección o a residencias originalmente construídas bajo el inciso A de esta sección, se pagarán $25 por cada $5,000 o fracción del costo total de la obra. En todos los casos de residencias construídas originalmente bajo el inciso A, y los subincisos 1 y 2 del inciso B, los primeros $10,000 estarán exentos del pago de arbitrios.

(4)   No obstante cualquier disposición contenida en este apartado B, cuando la obra a realizarse se trate de la construcción, reparación, ampliación, demolición, alteración o mejora de una piscina, se pagará $300 o arbitrio provisto en el apartado A de esta sección, se pagará el dos y medio por ciento (2.5%) del costo total de la obra.

(5)   Toda construcción de residencia principal y/o mejoras a la misma, estará exenta del pago de arbitrio. 4[ta] Sección inciso (B)(1), Ordenanza Núm. 8.

[39] Las excepciones son las siguientes:

(1) Cuando la obra se realizare y vaya a utilizarse como una residencia unifamiliar, cuya construcción no sea parte de un proyecto de vivienda, de urbanización, condominio u otro proyecto de similar naturaleza cuyo costo total sea de $50,000 o menos, se pagará un arbitrio de dos punto cinco (2.5%) por cada mil ($1,000) o fracción de mil dólares del costo de la obra, disponiéndose, que los primeros treinta mil ($30,000) estarán exentos del pago de arbitrios. De ser más de $50,000, le aplicará el uno por ciento (1%) al exceso de $50,000.

(2) Cuando la obra a realizarse se trate de reparaciones, alteraciones y mejoras, cuyo costo sea de $10,000 o más, se pagará cuatro dólares ($4.00) por cada mil ($1,000) o fracción adicional del costo total de la obra.

(3) No obstante, cualquier otra disposición contenida en este apartado (B), cuando la obra a realizarse se trate de la construcción, reparación, ampliación, demolición, alteración o mejora de piscina, se pagará

(Continúa . . .)

IV

En su primer señalamiento de error, la peticionaria alega que es inválida la imposición del arbitrio aquí en cuestión toda vez que no constituye una *"contribución sobre ingresos"* según definida por la Ley Buck. Conforme a ello, argumenta que el arbitrio no podía ser válido debido a que la propia Ley de Municipios Autónomos reconocía que el mismo se imponía sobre el derecho ("fee") que los municipios imponían por el derecho de llevar a cabo una actividad de construcción dentro de sus límites territoriales. Alegó, además, que no podía ser una contribución porque el mismo se computaba a base del costo en que se incurría para realizar el proyecto y no sobre ingresos.

De igual forma, alegó que el referido arbitrio se imponía al comienzo de la obra, momento en el que el contratista no había generado ingreso alguno. Por último, expuso, como segundo señalamiento de error, que era inválida la imposición del arbitrio en atención a la inexistencia de quid pro quo; es decir que HBA, como

———————————

el arbitrio provisto en el apartado (A) de esta Sección.

(4) Cuando la obra a realizarse se trate de movimiento de tierras, cuyo costo no esté incluido en el costo de cualquier obra de otra forma gravada por esta Sección, se pagará el 2.5 % del costo total de la obra.

(5) Toda construcción de residencia principal estará exenta del pago de arbitrios en los primeros $50,000. El exceso de $50,000, pagará punto cinco por ciento (0.5%) por cada fracción de mil ($1,000). 3$^{ra}$ Sección (B)(1-5), Ordenanza Núm. 33.

contribuyente, no obtendría beneficio alguno a cambio del pago del aludido arbitrio. <u>No le asiste la razón</u>.

Como vimos anteriormente, <u>para que la imposición del arbitrio sea válida lo único que es determinante es que la misma pueda ser considerada como una *"contribución sobre ingresos"* al amparo de la Ley Buck</u>. No es determinante el hecho de que el arbitrio se imponga previo al comienzo de la obra o por el derecho de llevar a cabo cierta actividad dentro del municipio.

Como mencionamos anteriormente, el arbitrio aquí en cuestión se calcula a base de un por ciento del costo total de la obra. El referido arbitrio puede ser pagado por el contratista o por el dueño de la obra. Ciertamente cuando es el dueño el que paga el arbitrio el mismo recaerá sobre los costos incurridos por éste para llevar a cabo la obra. No obstante, cuando es el contratista el que paga el arbitrio el mismo recaerá sobre el ingreso bruto del contratista. Es decir, el costo total de la obra cuando es tributado al contratista constituye el ingreso bruto que recibe el contratista con respecto a los servicios prestados bajo el contrato de construcción.

Somos del criterio que el arbitrio de construcción impuesto por el Municipio de Ceiba a HBA, es una *"contribución sobre ingresos"*, conforme la <u>amplia definición</u> de dicho concepto contenida en la Ley Buck, ante. Realmente no procede otra conclusión; ello en vista no solo de la terminología de dicho estatuto, sino que de

la casuística, tanto federal como estatal, interpretativas de la Ley Buck. En consecuencia, resolvemos que dicho arbitrio es uno procedente en derecho.

V

Por los fundamentos anteriormente expuestos, procede dictar Sentencia confirmatoria de la emitida por el Tribunal de Apelaciones, devolviéndose el caso al tribunal de primera instancia para la continuación de procedimientos consistentes con lo aquí resuelto.

Se dictará Sentencia de conformidad.


FRANCISCO REBOLLO LÓPEZ
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

HBA Contractors, Inc.

    Demandante-peticionaria

       vs.                CC-2003-639     CERTIORARI

Municipio de Ceiba

    Demandado-recurrido

SENTENCIA

San Juan, Puerto Rico, a 6 de diciembre de 2005

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia confirmatoria de la emitida en el presente caso por el Tribunal de Apelaciones, devolviéndose el caso al Tribunal de Primera Instancia, Sala Superior de Fajardo, para la continuación de procedimientos consistentes con lo aquí resuelto.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Rivera Pérez no intervino.

Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo